**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRAIG ARTHUR HUMPHRIES; WENDY
DAWN ABORN HUMPHRIES,
        *Plaintiffs-Appellants,*

v.

COUNTY OF LOS ANGELES; LEROY
BACA, individually and in his
official capacity as Los Angeles
County Sheriff; MICHAEL L.
WILSON, individually and in his
official capacity as a Detective
and/or Deputy of the Los Angeles
County Sheriff's Department;
CHARLES T. ANSBERRY, individually
and in his official capacity as a
Detective of the Los Angeles
County Sheriff's Department; BILL
LOCKYER, Attorney General, in his
official capacity as Attorney
General of the State of California,
        *Defendants-Appellees.*

No. 05-56467

D.C. No.
CV-03-00697-JVS

ORDER
AMENDING
OPINION AND
ORDER,
DENYING
APPELLEE
COUNTY OF LOS
ANGELES'
PETITION FOR
REHEARING AND
REHEARING EN
BANC, DENYING
APPELLEE BILL
LOCKYER'S
PETITION FOR
REHEARING AND
REHEARING EN
BANC,

563

GRANTING
APPELLANTS'
MOTION FOR
CLARIFICATION,
GRANTING IN
PART
APPELLANTS'
PETITION FOR
REHEARING OR
RECONSIDERATION
AND AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
October 19, 2007—Pasadena, California

Filed November 5, 2008
Amended January 15, 2009

Before: Jay S. Bybee and Milan D. Smith, Jr.,
Circuit Judges, and Richard Mills,* District Judge.

Opinion by Judge Bybee

---

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

**COUNSEL**

Esther G. Boynton (argued), Beverly Hills, California, for the plaintiffs-appellants.

Mark D. Rutter, Carpenter, Rothans & Dumont, Los Angeles, California; Martin Stein, Alison Turner, Lillie Hsu (argued), Greines, Martin, Stein & Richland LLP, Los Angeles, California, for the defendants-appellees.

Edmund G. Brown Jr., Attorney General of the State of California, David S. Chaney, Chief Assistant Attorney General, James T. Schiavenza, Senior Assistant Attorney General, Marsha S. Miller, Supervising Deputy Attorney General, Paul C. Epstein (argued), Deputy Attorney General, State of California Department of Justice, Office of the Attorney General, Los Angeles, California, for the defendant-appellee.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, New York, for the amicus National Coalition for Child Protection Reform.

**ORDER**

The opinion, filed November 5, 2008, slip op. 15041, is amended as follows:

1. At slip op. 15056, first full paragraph, line 20, replace "susbstantiated" with "substantiated."

2. At slip op. 15059 n.8, second full paragraph, line 14 of the footnote, replace "If the parties provide" with "If a party provides."

3.    At slip op. 15062, first full paragraph, line 18, replace "County's CACI-related policies" with "County's and State's CACI-related policies."

4.    At slip op. 15084 n.15, line 7 of the footnote, replace "district court" with "district attorney"; also replace "affect" with "effect."

5.    At slip op. 15086, second full paragraph, line 31, replace "very type of liberty interest" with "very type of interference with a liberty interest."

6.    At slip op. 15094, second full paragraph, line 31, delete the following: "By failing to do so, LASD's custom and policy violated the Humphries' constitutional rights. Therefore, we deny the County summary judgment on this issue." Add the following:

> By failing to do so, it is possible that the LASD adopted a custom and policy that violated the Humphries' constitutional rights. However, because this issue is not clear based on the record before us on appeal—and because the issue was not briefed by the parties—we remand to the district court to determine whether or not the County is entitled to qualified immunity.

7.    At slip op. 15095, line 1, replace "judgment to the County" with "judgment to the State and the County"

In addition, the panel's order, filed November 5, 2008, addressing the parties' costs is amended to delete "and fees."

With these amendments, the panel has voted to otherwise deny appellee County of Los Angeles' petition for rehearing. Judge Bybee and Judge Smith have voted to deny the petition for rehearing en banc, and Judge Mills recommended denying the petition for rehearing en banc. The full court has been

advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. Appellee County of Los Angeles's Petition for Rehearing and Rehearing En Banc is DENIED.

The panel has voted to deny appellee Bill Lockyer's petition for rehearing. Judge Bybee and Judge Smith have voted to deny the petition for rehearing en banc, and Judge Mills recommended denying the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. Appellee Bill Lockyer's Petition for Rehearing and Suggestion for Rehearing En Banc is DENIED.

With these amendments, the panel has voted to grant appellants' motion for clarification. Appellant's Motion for Clarification is GRANTED.

With these amendments, the panel has also voted to grant in part appellant's petition for rehearing or reconsideration of the November 5, 2008 order. Appellant's Petition for Rehearing or Reconsideration of the November 5, 2008 Order is GRANTED IN PART.

No further petitions for rehearing or rehearing en banc will be accepted.

---

## OPINION

BYBEE, Circuit Judge:

Appellants Craig and Wendy Humphries are living every parent's nightmare. Accused of abuse by a rebellious child, they were arrested, and had their other children taken away from them. When a doctor confirmed that the abuse charges

could not be true, the state dismissed the criminal case against them. The Humphries then petitioned the criminal court, which found them "factually innocent" of the charges for which they had been arrested, and ordered the arrest records sealed and destroyed. Similarly, the juvenile court dismissed all counts of the dependency petition as "not true."

Notwithstanding the findings of two California courts that the Humphries were "factully innocent" and the charges "not true," the Humphries were identified as "substantiated" child abusers and placed on California's Child Abuse Central Index ("the CACI"), a database of known or suspected child abusers. As the Humphries quickly learned, California offers no procedure to remove their listing on the database as suspected child abusers, and thus no opportunity to clear their names. More importantly, California makes the CACI database available to a broad array of government agencies, employers, and law enforcement entities and even requires some public and private groups to consult the database before making hiring, licensing, and custody decisions.

This case presents the question of whether California's maintenance of the CACI violates the Due Process Clause of the Fourteenth Amendment because identified individuals are not given a fair opportunity to challenge the allegations against them. We hold that it does.

## I.    FACTS AND PROCEEDINGS

### A.    *The Statutory Scheme*

#### 1.    The Child Abuse and Neglect Reporting Act

California maintains a database of "reports of suspected child abuse and severe neglect," known as the Child Abuse Central Index or CACI. CAL. PENAL CODE § 11170(a)(2). California has collected such information since 1965, *see* 1965 Cal. Stat. 1171, and since 1988, the maintenance of the CACI

has been governed by the Child Abuse and Neglect Reporting Act ("CANRA"), CAL. PENAL CODE §§ 11164-11174.

### a.   Inclusion in the CACI

There are many different ways a person can find themself listed in the CACI. CANRA mandates that various statutorily enumerated individuals report instances of known or suspected child abuse and neglect either to a law enforcement agency or to a child welfare agency. *Id.* § 11165.9. These agencies, in turn, are required to conduct "an active investigation," *id.* § 11169(a), which involves investigating the allegation and determining whether the incident is "substantiated, inconclusive, or unfounded," CAL. CODE REGS. tit. 11, § 901(a) (2008).

In an attempt by the legislature to demonstrate how many negatives it could place in a single provision, CANRA then provides that the agency shall send the California Department of Justice ("CA DOJ") a written report "of every case it investigates of known or suspected child abuse or severe neglect which is determined not to be unfounded," but that the "agency shall not forward a report to the [CA DOJ] unless it has conducted an active investigation and determined that the report is not unfounded." CAL. PENAL CODE § 11169(a). CANRA defines a report as "unfounded" if it is "determined by the investigator who conducted the investigation [1] to be false, [2] to be inherently improbable, [3] to involve an accidental injury, or [4] not to constitute child abuse or neglect." *Id.* § 11165.12(a). There is no further definition of what it means for a report to be "false" or "inherently improbable," and no discussion of the standard of proof by which that determination is to be made. Presumably, a report is "not unfounded" if the investigator determines that it meets none of these four criteria.

CANRA defines two other categories of reports, those that are "substantiated" and those that are "inconclusive." A "sub-

stantiated report" means that "the investigator who conducted the investigation" determined that the report "constitute[d] child abuse or neglect . . . based upon evidence that makes it more likely than not that child abuse or neglect occurred." *Id.* § 11165.12(b). An "inconclusive report" means that "the investigator who conducted the investigation" found the report "not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect . . . occurred." *Id.* § 11165.12(c). Both inconclusive and substantiated reports are submitted to the CA DOJ for inclusion in the CACI. *See id.* §§ 11169(a), (c), 11170(a)(3).

To summarize, we understand section 11169(a), when read in conjunction with section 11165.12, to require agencies to investigate all reports of child abuse. Each reported incident of child abuse must then be categorized as (1) "substantiated," meaning it is more likely than not that child abuse or neglect occurred; (2) "inconclusive," meaning there is insufficient evidence to determine whether child abuse and/or neglect occurred; or (3) "unfounded," meaning the report is false, inherently improbable, an accidental injury, or does not constitute child abuse or neglect. It appears that "substantiated" and "inconclusive" reports include everything that is "not unfounded." The agency must submit both "substantiated" and "inconclusive" reports for inclusion in the CACI.

Given the high standard of proof required for a report to be dismissed as "unfounded"—false or inherently improbable— and the low standard of proof required for a report to be categorized as "substantiated"—more likely than not—with "inconclusive" presumably encompassing everything in between, we understand the minimum evidence required for CANRA to compel the submission of a report to be something less than a preponderance, but more than a scintilla. CANRA further requires that the CA DOJ "shall maintain an index of all reports of child abuse and severe neglect submitted pursuant to" the process described above. *Id.* § 11170(a)(1). The CACI

is maintained by means of a computerized data bank. *See People v. Bernstein*, 243 Cal. Rptr. 363, 367 (Cal. Ct. App. 1987).

    b.   Consequences of Inclusion in the CACI

   CANRA states that the CA DOJ shall make the information in the CACI available to a broad range of third parties for a variety of purposes. For example, the information in the CACI is made available

> to the State Department of Social Services, or to any county licensing agency that has contracted with the state for the performance of licensing duties . . . concerning any person who is an applicant for licensure or any adult who resides or is employed in the home of an applicant for licensure or who is an applicant for employment in a position having supervisorial or disciplinary power over a child or children, or who will provide 24-hour care for a child or children in a residential home or facility, pursuant to [various statutory sections].

CAL. PENAL CODE § 11170(b)(4). The information is also provided to persons "making inquiries for purposes of pre-employment background investigations for peace officers, child care licensing or employment, adoption, or child placement." CAL. CODE REGS. tit. 11, § 907(b) (2008); *see also* CAL. PENAL CODE § 11170(b)(8). The "Court Appointed Special Advocate program that is conducting a background investigation of an applicant seeking employment with the program or a volunteer position as a Court Appointed Special Advocate" also has access to CACI information. CAL. PENAL CODE § 11170(b)(5).

   The scope of CANRA is not limited to California institutions. CANRA makes the CACI information available "to an out-of-state agency, for purposes of approving a prospective

foster or adoptive parent or relative caregiver for placement of a child" so long as "the out-of-state statute or interstate compact provision that requires that the information received in response to the inquiry shall be disclosed and used for no purpose other than conducting background checks in foster or adoptive cases." *Id.* § 11170(e)(1). Thus, it appears that if another state's agencies require CACI information for foster or adoptive purposes, the CA DOJ is also obligated to make it available.[1]

> CANRA provides that agencies obtaining the CACI information are responsible for obtaining the original investigative report from the reporting agency, and for drawing independent conclusions regarding the quality of the evidence disclosed, and its sufficiency for making decisions regarding investigation, prosecution, licensing, placement of a child, employment or volunteer positions with a CASA program, or employment as a peace officer.

*Id.* § 11170(b)(9)(A). The same provision also applies to out of state agencies that receive CACI information. *Id.* § 11170(e)(2).

Although CANRA itself only requires that the CA DOJ make this information available, other statutory provisions mandate that certain agencies consult the CACI prior to issuing a variety of state-issued licenses or other benefits. For example, California Health and Safety Code § 1522.1 provides that "[p]rior to granting a license to, or otherwise approving, any individual to care for children, the [State Department of Social Services] shall check the [CACI]. CAL. HEALTH & SAFETY CODE § 1522.1(a); *see id.* § 1502(b). Simi-

---

[1]Although the CACI information can apparently be released under these statutes to administrative agencies, private licensing agencies, private employers, or law enforcement entities, we will generally refer to these groups collectively throughout the opinion as "agencies."

larly, in order to work as a volunteer in crisis nurseries, California law mandates that "[v]olunteers shall complete a [CACI] check." *Id.* § 1526.8(b)(2). Also, "[p]rior to granting a license to or otherwise approving any individual to care for children in either a family day care home or a day care center, the [State Department of Social Services] shall check the [CACI]." *Id.* § 1596.877(b).[2]

> California Welfare and Institutions Code § 361.4 similarly requires that [w]henever a child may be placed in the home of a relative, or a prospective guardian or other person who is not a licensed or certified foster parent, the county social worker shall cause a check of the [CACI] . . . to be requested from the [CA DOJ]. The [CACI] check shall be conducted on all persons over 18 years of age living in the home.

CAL. WELF. & INST. CODE § 361.4(c). Finally, California has implemented a pilot program through the State Department of Social Services ("DSS") to create a "child-centered resource family approval process" in lieu of existing processes for "licensing foster family homes, approving relatives and nonrelative extended family members as foster care providers, and approving adoptive families." *Id.* § 16519.5(a). The approval standards under this statute include "utilizing a check of the [CACI]." *Id.* § 16519.5(d)(1)(A)(i). Based on these provisions, it is apparent that the CACI listing plays an integral role in obtaining many rights under California law, including employment, licenses, volunteer opportunities, and even child custody. *See also* Alisha M. Santana, *A Pointer System that Points to the Nonexistent: Problems with the Child Abuse*

---

[2] We also note that, although it does not specifically mandate the agency to reference the CACI, in language similar to CANRA, § 1596.607 of the Health and Safety Code allows DSS to deny a "trustline applicant" if there is evidence of "substantiated child abuse." CAL. HEALTH & SAFETY CODE § 156.607.

*Central Index (CACI)*, 4 WHITTIER J. CHILD & FAM. ADVOC. 115, 115-16 (2004) (describing the case of a grandmother denied custody of her grandchildren because DSS discovered two hits on the CACI matching her name).

### c.    Removal From the CACI

CANRA requires that at the time the agency forwards the report to the CA DOJ for inclusion in the CACI, "the agency shall also notify in writing the known or suspected child abuser that he or she has been reported to the [CACI]." CAL. PENAL CODE § 11169(b). The identified child abuser may obtain the report of suspected child abuse and information contained within their CACI listing. *Id.* § 11167.5(b)(11). Understandably, notified individuals who believe that they have wrongfully been included in the CACI would want to be removed from the CACI as expeditiously as possible. CANRA provides that an individual who was originally listed in the CACI pursuant to an "inconclusive or unsubstantiated report" will be deleted from the CACI after ten years, as long as no subsequent report containing his or her name is received within that time period. *Id.* § 11170(a)(3). There is no provision for removing an individual who was originally listed in the CACI pursuant to a "substantiated report"; such a person apparently remains listed in the CACI permanently. *See id.* § 11170(a)(1).

CANRA offers no procedure for challenging a listing on the CACI. CANRA does provide that "[i]f a report has previously been filed which subsequently proves to be unfounded, [the CA DOJ] shall be notified in writing of that fact and shall not retain the report." *Id.* § 11169(a). The statute does not describe *who* must notify the CA DOJ of that fact, or how the determination that a report has "subsequently prove[d] to be unfounded" is to be made. CANRA also provides that the CACI "shall be continually updated by the department and shall not contain any reports that are determined to be unfounded." *Id.* § 11170(a)(1). By using the passive voice,

CANRA fails to specify who is supposed to determine that a report is unfounded, or how to make that decision in order to remove unfounded reports from the CACI.

Apparently, only the submitting agency can decide if a report has proved unfounded. CANRA provides that "[t]he submitting agencies are responsible for the accuracy, completeness, and retention of the reports," thus suggesting that the submitting agencies are also responsible for removing reports that are determined to be unfounded. *Id.* § 11170(a)(2). Furthermore, as explained above, CANRA defines an "unfounded report" as "a report that is determined *by the investigator who conducted the investigation* to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect." *Id.* § 11165.12(a) (emphasis added); *see id.* § 11165.12(b) (a "substantiated report" means "a report that is *determined by the investigator . . .* ") (emphasis added). Whether this definition solely references the initial determination of listing someone on the CACI, or whether it also constitutes the definition for a continuing obligation to remove someone from the CACI is unclear. These provisions suggest, however, that the investigator and agency that conducted the investigation are responsible for making, and thus correcting, the determination that a report is unfounded.

Although CANRA itself provides no procedure for an individual to challenge a CACI listing, nothing in the statute prevents a submitting agency from enacting some procedure to allow an individual to challenge their listing or seek to have a determination made that a report is "unfounded." *See id.* § 11170(a)(2). CANRA also contemplates that the CA DOJ "may adopt rules governing recordkeeping and reporting," which may allow the CA DOJ to enact some procedure beyond that provided by CANRA. *Id.* § 11170(a)(1). To this point, we are unaware of any regulations that provide additional regulatory procedures for challenging a listing on the CACI or the validity of the underlying report. To the contrary,

the CA DOJ explicitly "presumes that the substance of the information provided is accurate and does not conduct a separate investigation to verify the accuracy of the investigation conducted by the submitting agency." CAL. CODE REGS. tit. 11, § 904 (2008).

## B. *The Humphries' Nightmare*

The Humphries' nightmarish encounter with the CANRA system began on March 17, 2001, when S.H., Craig's fifteen year-old daughter from a previous marriage, took their car and drove to her biological mother's home in Utah. S.H. had previously lived in Utah with her biological mother and stepfather and their three younger children. In June 2000, S.H's biological mother called Craig and said she wanted S.H. to live with the Humphries in Valencia, California, on a trial basis. The night of March 17, S.H. took the Humphries' car without their knowledge, drove to her mother's home in Utah, and reported that the Humphries had been abusing her for several months. An emergency room physician diagnosed "non-accidental trauma, with extremity contusions."

## 1.    The Humphries' Arrest and Inclusion in the CACI

Based on an investigation from the Utah police, the victim's statement, and emergency room records describing the victim's allegations, on April 11, 2001, Michael L. Wilson, a detective for the Family Crimes Bureau of the Los Angeles County Sheriff's Department ("LASD"), obtained probable cause warrants to arrest the Humphries for cruelty to a child, CAL. PENAL CODE § 273a(a), and torture, *id.* § 206. On April 16, Detective Wilson, accompanied by fellow detective Charles Ansberry, arrested Craig and Wendy Humphries, and booked them on the single charge of felony torture under California Penal Code § 206. The same day, a Sheriff's deputy, without a warrant, picked up the Humphries' two other children from their schools and placed them in protective custody.[3]

---

[3]The Humphries have asserted a § 1983 claim regarding the warrantless seizure of the children. That claim is not before us on this appeal.

Both children denied any fear of abuse or mistreatment and indicated their desire to return home. Custody of the children was then transferred to the County Department of Children and Family Services, which placed the children in foster care.

On April 17, 2001, the day after the Humphries were arrested, Detective Wilson completed a child abuse investigation report identifying the Humphries' case as a "substantiated report" of child abuse.[4] Pursuant to CANRA, this information was sent to the CA DOJ, which in turn created a CACI listing identifying Craig and Wendy Humphries as child abuse suspects with a "substantiated" report.

### 2. Judicial Proceedings Exonerating the Humphries

#### a. The Criminal Case

On April 18, 2001, Detective Wilson filed a complaint in the Los Angeles County Superior Court, charging the Humphries with corporal injury to a child, CAL. PENAL CODE § 273d(a), and cruelty to a child by endangering health, *id.* § 273a(b), both misdemeanors.

On August 29, 2001, the Humphries' criminal case was dismissed.[5] The prosecutor had learned that in November 2000,

---

[4]At the time that Detective Wilson filed his report, a "substantiated" report of child abuse was defined as one where the investigator found "credible evidence" of abuse. CAL. PENAL CODE § 11165.12(b) (2001). As discussed above, § 11165.12 has since been amended to define a "substantiated" report as one "determined by the investigator who conducted the investigation to constitute child abuse or neglect . . . based upon evidence that makes it more likely than not that child abuse or neglect . . . occurred." *Id.* § 11165.12(b).

[5]There is some dispute as to whether the felony charge for which the Humphries were originally booked on April 16 is distinct from the misdemeanor charge filed on April 18. The Humphries contend that the district attorney rejected the attempt to file a felony action against them but allowed the case to be filed for misdemeanor consideration. According to

Dr. Isaac Benjamin Paz surgically removed a melanoma on S.H.'s shoulder. S.H. had follow-up visits with Dr. Paz in December 2000 and March 2001, periods that corresponded with S.H.'s claims of abuse. On all these occasions, Dr. Paz examined S.H.'s entire body, and saw no sign of abuse. The prosecutor determined that this information "contradict[ed] the basic part of [S.H's] testimony that she was injured during the entire time" and agreed that the Humphries criminal case for the misdemeanor charges should be dismissed in furtherance of justice. The felony torture charges on which the Humphries had originally been booked were also dismissed.

The Humphries then successfully petitioned the criminal court under California Penal Code § 851.8 for orders finding them "factually innocent" of the felony torture charge,[6] and

the Humphries it was this misdemeanor complaint that was dismissed on August 29, 2001. Because this case is before us on a motion for summary judgment by the state and county parties, we assume the Humphries' account to be true, and from the record it appears that the Humphries were never indicted on the felony charge. Regardless, the petition to seal and destroy their arrest records indicates that the disposition of the torture charges was a "court dismissal."

[6]The Humphries argue that the district court erred in concluding that the finding of "factual innocence" was not admissible as evidence under California law. We disagree. California Penal Code § 851.8(i) clearly states that a finding of factual innocence "shall not be admissible as evidence in any action." CAL. PENAL CODE § 851.8(i). The Humphries contend that § 851.8(i) is qualified by § 851.8(k), which provides that sealed records may be "submitted into evidence" on "a showing of good cause" in a civil action brought by the arrested person against the arresting officers or law enforcement jurisdiction. CAL. PENAL CODE § 851.8(k). Section 851.8(k), however, does not allow the "finding of factual innocence" to be submitted into evidence, but rather the underlying "sealed records."

Nevertheless, neither § 851.8(i) nor § 851.8(k) applies to our use of the factual innocence determination in this opinion. Here, even if the Humphries had never been arrested at all, such that there were no § 851.8 arrest warrants to seal, Detective Wilson could have still filed a "substantiated report" resulting in their listing on the CACI. Our determination as to the

requiring the arrest records pertaining to that charge be sealed and destroyed.[7] A finding of factual innocence means that the court found "that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made." CAL. PENAL CODE § 851.8(b).

### b. The Juvenile Court Case

On April 17, 2001, in separate, non-criminal proceedings, Detective Wilson requested that Los Angeles County file a juvenile court dependency petition to have the Humphries' two children declared dependent children of the juvenile court based on the fact that their "sibling has been abused or neglected." On April 19, the County filed a dependency petition against the Humphries based on S.H.'s allegations. After a hearing on June 12, the juvenile court ordered that the Humphries retain custody of their children, and dismissed all counts as "not true."[8]

---

constitutionality of CANRA is thus not dependant on the underlying arrest. We therefore discuss the factual innocence finding, not as a matter of evidence, but rather as illustrative of the legal quagmire in which the Humphries find themselves. Under California law, they could petition a court for a "factual innocence" determination, but could not challenge their inclusion on the CACI.

[7]The Humphries argue that the district court erred in disregarding the sealing orders as they relate to the information included in their CACI listing. The district court found that the Humphries' contention that the Appellees were maintaining records in violation of the Sealing Orders was not properly before the court because the claim was not made in the complaint. We find that the allegations contained in paragraphs 5 and 6 of the complaint sufficiently allege the issue by stating that "the order . . . requires that plaintiffs' arrest records be sealed and scheduled for future destruction. . . . Nevertheless, defendants still refuse to expunge plaintiffs' CACI records." Insofar as this issue is relevant to future proceedings, the district court may consider the claim.

[8]Under the California Rules of Court, the juvenile court is only authorized to find allegations "true" or "not proved." See CAL. CT. R. 1450(f) & (h) (renumbered and amended as 5.684 effective Jan. 1, 2007). The state

3.    The Humphries Seek Removal from the CACI

As required by CANRA, in May 2001, the Humphries were notified that they were listed in the CACI. The notice informed them that if they believed the report was unfounded, and they desired a review, that they should address their request to Detective Wilson. In May 2002, the Humphries contacted LASD's Family Crimes Bureau through their attorney. They discovered that Detective Wilson no longer worked at the Bureau and there was no available procedure for them to challenge their listing in the CACI. On May 9, 2002, LASD Sergeant Michael Becker advised the Humphries' attorney that after conducting an investigation, the LASD would not reverse its report labeling the Humphries as "substantiated" child abusers for the purposes of the CACI. Becker indicated that the fact that charges were filed "would indicate to us that some sort of crime did occur" and the fact that the case was dismissed "would not negate the entries" into the CACI.

In October 2003, the CA DOJ asked LASD to complete a confirmation questionnaire regarding the Humphries' CACI listing. The questionnaire was answered by a civilian clerical worker who confirmed that the report was still "substantiated"

_____

and county parties argue that the juvenile court's "not true" finding does not mean that the allegations are affirmatively false. Regardless, there is no dispute that the juvenile court wrote that the allegations were "not true." Any argument regarding whether the judge should or should not have done so should have been made at the time of the juvenile court proceedings.

The Humphries also argue that the district court erred in failing to give collateral estoppel effect to the juvenile court's "not true" determination. The district court stated in a footnote that while the collateral estoppel argument "would appear to have merit, the Court need not address that issue in view of its ruling." If a party provides a reason for addressing the issue in light of this opinion, on remand the district court shall make a more definitive finding of the collateral effect of the juvenile court's judgment.

as of October 31, 2003. Despite the fact that two independent California tribunals had found that the allegations underlying the Humphries' CACI listing were "not true" and that the Humphries are "factually innocent," the CA DOJ continues to list the Humphries in the CACI as substantiated child abusers. Furthermore, because the Humphries were listed pursuant to a "substantiated report," they will remain listed on the CACI indefinitely.

In addition to the harm already dealt to the Humphries' reputation by appearing on a list of actual or suspected child abusers, the Humphries have also alleged that the CACI now places a burden on their ability to pursue some of their normal goals and activities. The Humphries have indicated that they are hesitant to seek these opportunities for fear that the CACI listing will both influence their ability to obtain certain benefits and further injure their already damaged reputation. For example, the Humphries have expressed a desire to work or volunteer at the Florence Crittenton Center in Los Angeles, a community center offering child care and a variety of other services. Bernice Williams, the Human Resources Manager at the center stated, by affidavit, that all adults must undergo a CACI check prior to obtaining clearance to volunteer or teach at the center. Thus, the Humphries will have to submit to a CACI search before even having an opportunity to volunteer or work at the center.

Similarly, Wendy currently works as a special education teacher and resource specialist at a public school in California. She possesses a number of teaching credentials that must be periodically renewed in order to maintain her current employment—a renewal process that requires her to apply to the California Commission on Teacher Credentialing ("CCTC"). The Humphries have introduced evidence indicating that the information available on the CACI might have an impact on her ability to obtain educational credentials.[9]

---

[9]The Humphries introduced as an exhibit a letter by Peter P. Castillo, an attorney for the DSS. The letter states that "[t]he law requires that [the

Wendy has also indicated a desire to pursue a degree in psychology from the University of California at Los Angeles. Two courses of interest within the psychology department, 134 A/D and 134 B/E, place all of the students in a child care program licensed by the state of California. To enroll in these classes, all potential students must pay for and submit to a CACI check.

### 4.  Procedural History

The Humphries initiated this action in federal district court on August 27, 2002. The Humphries' First Amended Complaint originally included eight counts based on state and federal claims, but on April 14, 2003, the district court dismissed all the state law counts on a Rule 12(b)(6) motion. In the remaining three claims, the Humphries sought relief pursuant to 42 U.S.C. § 1983. They alleged that three actions by California officials deprived them of various rights under the United States Constitution: the Humphries' arrest and incarceration, the Humphries' initial and continued inclusion in CACI, and the seizure and subsequent placement of the Humphries' children in temporary protective custody.

---

Community Care Licensing Division ("CCLD")] check all child care applicants and employees against the CACI" and goes on to note that CCLD will "share information" with CCTC if requested. In response, the state introduced an affidavit from Castillo reporting that the CCTC "is not one of the agencies authorized by statute to receive [CACI] information" and that his statement in the letter regarding shared information only referred to information that CCLD was permitted to disclose. Based on this exchange and without giving the Humphries an opportunity to respond, the district court found that "it is clear that Wendy cannot and will not be harmed in her pursuit of a teaching credential as a result of being listed on the Index." Viewing the evidence in the light most favorable to the Humphries, Castillo's measured statement did not require the broad conclusion reached by the district court. Thus, insofar as the need arises on remand, the parties are free to introduce additional evidence regarding the obstacles CACI places on the opportunity for Wendy to pursue her credentials.

The Humphries sought three types of relief based on these claims. The Humphries demanded damages for the constitutional violations resulting from the government's conduct. In addition to damages, on the allegations related to the Humphries' listing on the CACI, the Humphries sought an injunction ordering the County of Los Angeles to notify the CA DOJ that LASD's report to the CACI is unfounded, and to prohibit the State from retaining or disclosing the CACI records on the Humphries based on any report from LASD. The Humphries also sought a judicial declaration that CANRA and the County's and State's CACI-related policies are unconstitutional because they provide no means for people, such as the Humphries, to dispute or expunge their CACI listing or to prevent disclosures of the listing and related records.

Appellees, the County of Los Angeles, Sheriff Leroy D. Baca, and Detectives Wilson and Ansberry ("County Appellees") and California Attorney General Bill Lockyer ("State") (collectively "Appellees"), moved for summary judgment on all claims. The district court denied Appellees' motion for summary judgment on the § 1983 claim regarding the warrantless seizure of the children, but granted Appellees' motion for summary judgment on the § 1983 claim arising out of the Humphries' initial and continued inclusion in the CACI, as well as the § 1983 claim arising out of the Humphries' arrest and incarceration. The Humphries appeal the grant of summary judgment with regard to their claims relating to their inclusion in the CACI, arguing that the Appellees' conduct in listing their names on the CACI and making CACI-related information available to third parties violates their right to due process under the Fourteenth Amendment.

## II.   ANALYSIS

[1] To establish a prima facie case under § 1983, the Humphries must establish that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution and

laws of the United States. *West v. Atkins,* 487 U.S. 42, 48 (1988). Furthermore, the Supreme Court has insisted that even if there is a qualified immunity issue, we must still consider the threshold question of the "existence or nonexistence of a constitutional right as the first inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). There is no question that the Humphries' listing on the CACI occurs under color of state law. Thus, the issue in this appeal is whether the initial and continued inclusion of the Humphries on the CACI deprives them of any rights secured by the Constitution and laws of the United States. We find that it does. Accordingly, after our discussion of the existence of a constitutional violation we consider whether the individual and institutional Appellees are entitled to immunity for their acts.

A.   *Procedural Due Process*

**[2]** The Humphries argue that Appellees violated their Fourteenth Amendment right to procedural due process by listing and continuing to list them on the CACI, without any available process to challenge that listing. In procedural due process claims, the deprivation of a constitutionally protected interest "is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Our analysis proceeds in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted). The district court found that the Humphries' listing on the CACI did not deprive them of any constitutionally protected liberty or property interest.[10]

---

[10]We review a district court's grant of summary judgment *de novo. Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). In conducting such a review, we must ensure that the district court correctly applied the law and that, viewing the evidence in the light most favorable to the non-moving party, no genuine issues of material fact remain. *Id.*

The court did not reach the second step of the due process analysis.

1. Deprivation of a Protected Liberty Interest

The Humphries contend that they have a liberty interest under the "stigma-plus" test of *Paul v. Davis*, 424 U.S. 693 (1976). The Humphries argue that the stigma of being listed in the CACI as substantiated child abusers, *plus* the various statutory consequences of being listed on the CACI constitutes a liberty interest, of which they may not be deprived without process of law. We agree.[11]

[3] In *Wisconsin v. Constantineau*, the Supreme Court held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." 400 U.S. 433, 437 (1971). The following year the Court stated that a government employee's liberty interest would be implicated if he were dismissed based on charges that "imposed on him a stigma or

---

[11]The Humphries also argue that they have a protected liberty interest created by the mandatory language in CANRA; a protected liberty interest in informational and familial privacy arising under the California Constitution, *see Burt v. County of Orange*, 15 Cal. Rptr. 3d 373, 381-82 (Cal. Ct. App. 2004); a protected liberty interest in familial privacy and autonomy under the federal constitution; and a protected liberty interest created by the sealing orders and California Penal Code § 851.8. Because we hold that the Humphries have been deprived of due process of law, and because it is not evident they would be entitled to any greater process or remedy if they successfully pressed these remaining liberty interests, we will not reach the merits of these arguments. We also decline to reach the Humphries' ill-developed claims to substantive due process based on a right of parents with children to live without unwarranted government interference and the Appellees' conduct relating to the sealing orders. Moreover, it is quite apparent to us that the same qualified immunity analysis would apply to the due process claims regardless of the underlying liberty interest asserted. Nevertheless, if the Humphries believe that these interests require a different due process or qualified immunity analysis than we have ordered here, they are free on remand to raise those claims before the district court and explain why the district court should address them.

other disability that foreclosed his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). In *Paul v. Davis*, the Supreme Court clarified that procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of "a right or status previously recognized by state law." 424 U.S. 693, 711 (1976). This holding has come to be known as the "stigma-plus test." *See Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006).

### a.  Stigma

**[4]** As the district court found, being labeled a child abuser by being placed on the CACI is "unquestionably stigmatizing." We have observed that there is "[n]o doubt . . . that being falsely named as a suspected child abuser on an official government index is defamatory." *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004); *see also Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994) (finding it beyond dispute that inclusion on a child abuse registry damages reputation by "branding" an individual as a child abuser). Indeed, "no conduct so unequivocally violates American ethics as . . . sexual predation upon the most vulnerable members of our society." *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 999 (9th Cir. 2008) (citation omitted). The horror deepens when such abuse occurs at the hands of the parents, who have an obligation to protect their children. *See id.* at 1013 (Bybee, J., dissenting) ("Our recognition that the victim's vulnerability or intimate relationship with her victimizer can render an act inherently base or vile simply reflects contemporary American mores.").

The Court has identified stigma on the basis of lesser accusations. In *Constantineau*, the chief of police had posted the plaintiff's name on a list that prohibited her from purchasing alcohol pursuant to a state statute forbidding the sale of alcoholic beverages to persons who had become hazardous by reasons of their "excessive drinking." 400 U.S. at 434-35. In

*Paul*, the plaintiff's picture appeared on a flyer of individuals who were suspected of shoplifting. 424 U.S. at 695. In both cases the Court found stigma. *Constantineau*, 400 U.S. at 435-37; *Paul*, 424 U.S. at 697, 701 (stating that imputing criminal behavior to an individual is generally considered "defamatory per se" and implicitly finding stigma by holding that stigma alone is insufficient). Being labeled a child abuser is indisputably more stigmatizing than being labeled an excessive drinker or a shoplifter. Indeed, to be accused of child abuse may be our generation's contribution to defamation per se, a kind of moral leprosy.

### b.  Plus

The more difficult issue is whether the Humphries can satisfy the "plus" test. The Humphries must show that, as the result of being listed in the CACI, "a right or status previously recognized by state law was distinctly altered or extinguished." *Paul*, 424 U.S. at 711; *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (reaffirming that an injury to reputation by itself is not a protected liberty interest under the Fourteenth Amendment).

As the Court explained in *Paul*, when the chief of police in *Constantineau* posted the plaintiff's name on a list forbidding the sale of alcohol to her, it "significantly altered her status as a matter of state law" by depriving her "of a right previously held under state law[—]the right to purchase or obtain liquor in common with the rest of the citizenry." *Paul*, 424 U.S. at 708. The Court concluded that "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." *Id*. at 708-09.

In *Paul* itself, the Louisville Chief of Police placed Davis' name on a flyer distributed to Louisville merchants containing a list of individuals thought to be active in shoplifting. *Id.* at 695. In contrast to the mandatory nature of the statute in *Con-*

*stantineau*, the flyer merely "came to the attention" of Davis' supervisor who warned him not to repeat his actions in the future. *Id*. at 696. The Court found that this harm to Davis' reputation was not sufficient to create a liberty interest. *Id*. at 712. Notably, no law had required the Chief of Police to distribute this flyer, nor did any law require employers to check the list. Thus, although any impairment to Davis' employment opportunities "flow[ed] from the flyer in question," his injury only occurred because the flyer happened to have "c[o]me to the attention of [his] supervisor." *Id*. at 696-97.

As a preliminary matter, the Appellees contend that the Humphries' attempt to satisfy the "plus" test is foreclosed by our decision in *Miller v. California,* 355 F.3d 1172 (9th Cir. 2004). In *Miller*, we confronted different questions concerning the rights of grandparents listed on the CACI. The Millers' three grandchildren had been removed from their parents' home, and the Millers were eventually named the children's guardians. *Id*. at 1173-75. In the meantime, as a result of a doctor's concern about possible sexual abuse, Charles Miller's name was listed on the CACI. *Id*. at 1174-75. The Millers brought suit to clear their names and argued that county employees, by placing Charles Miller's name on the CACI, had conspired to deprive them of a liberty interest to associate with their grandchildren. *Id.* at 1173-74. We held that the Millers had no "substantive due process right to family integrity or association as noncustodial grandparents of children who are dependents of the court, nor of a liberty interest in visiting their grandchildren." *Id*. at 1176.

In a separate argument, Charles Miller argued that he had suffered a stigma-plus injury to his reputation and had been denied an opportunity to be heard on the deprivation. *Id*. at 1177. We concluded that Miller had shown injury to his reputation, but could not establish the "plus" because he was "not legally disabled by the listing [on the CACI] alone from doing anything they otherwise could do." *Id*. at 1179. As we observed, the Millers were in fact awarded guardianship of

their grandchildren after Charles' name had been placed on the CACI. The only "plus" alleged in *Miller* was a fundamental liberty interest in preserving family association. *Id.* at 1178. We held that because grandparents have no constitutionally protected liberty interest in a relationship with their grandchildren, the Millers could not allege "plus" on those grounds. *Id.*

Significantly, we expressly declined to address whether the mere presence of Miller's name on the CACI denied him due process "because CANRA provides no procedure by which those suspected of being child abusers can challenge the allegations against them." *Id.* at 1179 n.4. The argument had not been properly presented to the district court and was not properly before us. We also did not address whether requiring agencies to search the CACI prior to issuing a license constitutes a viable "plus." We now take the opportunity to address these issues left open in *Miller*.

**[5]** The Humphries allege more than mere reputational harm—being listed on the CACI alters their rights in two general ways. First, state statutes mandate that licensing agencies search the CACI and conduct an additional investigation prior to granting a number of rights and benefits. These rights include gaining approval to care for children in a day care center or home, CAL. HEALTH & SAFETY CODE § 1596.877(b), obtaining a license or employment in child care, *id.* § 1522.1(a), volunteering in a crisis nursery, *id.* § 1526.8(b)(2), receiving placement or custody of a relative's child, CAL. WELF. & INST. CODE § 361.4(c), or qualifying as a resource family, *id.* § 16519.5(d)(1)(A)(i). These benefits are explicitly conditioned on the agency checking the CACI and conducting an additional investigation. Second, information in the CACI is specifically made available to other identified agencies: state contracted licensing agencies overseeing employment positions dealing with children, CAL. PENAL CODE § 11170(b)(4); persons making pre-employment investigations for "peace officers, child care licensing or employ-

ment, adoption, or child placement," *id.* § 11170(b)(8); individuals in the Court Appointed Special Advocate program conducting background investigations for potential Court Appointed Special Advocates, *id.* § 11170(b)(5), and out-of-state agencies making foster care or adoptive decisions, *id.* § 11170(e)(1). Although these agencies are not explicitly required by CANRA to consult the CACI, they may, as a practical matter, be required to do so by their own regulations or practices, as discussed below. Thus, inclusion in the CACI alters the Humphries' legal rights or status in a variety of ways that Californians who are not listed on the CACI are not subject to: applying for custody of a relative's child, becoming guardians or adoptive parents (inside or outside of California), obtaining a license for child care, becoming licensed or employed in a position dealing with children, obtaining employment as a peace-officer, and involvement in adoption and child placement. We have mentioned, and the district court found, that the Humphries were directly affected in their eligibility to work or volunteer at a local community center. The Humphries also introduced evidence indicating that Wendy was affected in her ability to renew her teaching credentials.

We recognize that being listed on the CACI may not fully extinguish the Humphries' rights or status. Agencies that obtain information from the CACI are responsible for "drawing independent conclusions regarding the quality of the evidence disclosed." *Id.* § 11170(b)(9)(A). Thus, for example, inclusion on the CACI does not necessarily bar the Humphries from obtaining a license for child care, but it does guarantee that the licensing entity will conduct an investigation anew before issuing or denying the license. However, we need not find that an agency will necessarily deny the Humphries a license to satisfy the "plus" test. Outright denial would mean that a listing on the CACI has extinguished the Humphries' legal right or status. Rather, *Paul* provides that stigma-plus applies when a right or status is "altered *or* extinguished." 424 U.S. at 711 (emphasis added).

**[6]** We hold that where a state statute creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated. A tangible burden exists in this context where a law effectively requires agencies to check a stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit. As outlined above, California created the CACI via CANRA and explicitly requires agencies to consult the CACI and perform an independent investigation before granting a number of licenses and benefits. This requirement places a tangible burden on a legal right that satisfies the "plus" test.

**[7]** We find that a tangible burden also exists where the plaintiff can show that, as a practical matter, the law creates a framework under which agencies reflexively check the stigmatizing listing—whether by internal regulation or custom—prior to conferring a legal right or benefit. CANRA appears to create such a legal framework. CANRA explicitly provides that a variety of agencies will have access to the CACI, and we cannot turn a blind eye to the actions of these other agencies merely because they are not explicitly required by statute to receive CACI information.

The record before us on this latter point is admittedly sparse. Nevertheless, as a practical matter, it is difficult to imagine that an agency charged with protecting California's children—through granting or denying licenses to work in child care, allowing people to engage in adoption or child-placement services, or considering potential Court Appointed Special Advocates—would fail to consult the CACI. There is possibly no information more relevant to determining whether a person should be permitted to have a license to work or care for children than whether that person has abused an innocent child in the past. As Bernice Williams, the Human Resources Manager at the Florence Crittenton Center in Los Angeles stated in her affidavit, "Before any adult is cleared to teach at our school, to work at our day care center, or to work or vol-

unteer anywhere within our facility, he or she must undergo Livescan screening, including a [CA DOJ CACI] check." We would be surprised to hear anything differently from other agencies or entities responsible for providing for the safety and education of children. Indeed, on top of the need to protect California's youth, hiring or giving a license to someone without checking the CACI could potentially lead to tort liability under California law. *See Juarez v. Boy Scouts of Am., Inc.*, 97 Cal. Rptr. 2d 12, 24-25 (Cal. Ct. App. 2000) ("[I]n California, an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him. [T]he theory of negligent hiring here encompasses the *particular risk of molestation by an employee* with a history of this specific conduct.") (internal citations and quotations omitted). Once an agency consults the CACI and finds adverse information, CANRA requires the agency to conduct an investigation and come to its own conclusion. CAL. PENAL CODE § 11170(b)(9)(A)

**[8]** Viewing the evidence in the light most favorable to the Humphries, we conclude that California has implemented a system whereby the CACI is reflexively consulted prior to the conferral of legal rights or benefits under California law, even where the statute does not necessarily require agencies to check the list on its face. The CANRA both stigmatizes the Humphries and creates an impediment to the Humphries' ability to obtain legal rights. The Humphries have asserted the existence of a sufficient liberty interest under the stigma-plus test, of which they may not be deprived without due process of law.

Our holding is consistent with *Paul.* In *Paul*, the Court was concerned that every insult by a police officer might create a due process right and turn the Fourteenth Amendment into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." 424 U.S. at 701.

This concern that "a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee," *id.* at 710, is not triggered here. Our decision is limited to those "stigma-plus" situations where both the defamatory statement and the tangible burden on a legal right are statutorily created. In *Paul*, individual officers independently chose to distribute a leaflet, and the stigmatizing language in the leaflet just happened to come to the attention of the plaintiff's private supervisor. In contrast, the burdens on the Humphries' abilities to obtain various licenses and other legal rights from the state of California are the result of state statutes creating the CACI, instructing state officers to put certain information on the CACI, and effectively mandating that various entities consult the CACI. The CACI is not just haphazard, second-hand information that happens to reach the ears of an employer. This case does not resemble the sort of state-court tort case that *Paul* feared.

In reaching this holding, we find the Second Circuit's reasoning in *Valmonte v. Bane* persuasive. 18 F.3d 992 (2d Cir. 1994). In *Valmonte*, the Second Circuit heard a challenge to the New York Central Register of Child Abuse and Maltreatment. Under the New York scheme, the Department of Social Services determined whether an allegation of child abuse was "indicated" or "unfounded." *Id.* at 995. If there was "some credible evidence" supporting a complaint, the report was deemed "indicated" and went into the Central Register; otherwise, it was deemed "unfounded," expunged from the Central Register, and destroyed. *Id.* As in California, state agencies, private businesses, and licensing agencies were required to check whether potential employees or applicants were on the Central Register. *Id.* The agency or business could hire the person only if the employer maintained a written record explaining why the person was suitable for employment or a license. *Id.* at 996. The court found that because agencies and employers would learn of Valmonte's inclusion on the Central Register "by operation of law . . . and . . . likely . . . will

choose not to hire her due to her status" the New York scheme "[did] not simply defame Valmonte, it place[d] a tangible burden on her employment prospects." *Id*. at 999, 1001. The Second Circuit explained that "[t]his is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state." *Id*. at 1001. *Valmonte* stands for the proposition that to satisfy stigma-plus, a child abuse registry does not need to create a per se bar to employment; it is sufficient that a child abuse registry, by operation of law, creates a "statutory impediment" or a "tangible burden" to being hired. *Id*. at 1001-02. *See also Dupuy v. Samuels*, 397 F.3d 493, 503-04, 509-11 (7th Cir. 2005) (finding that where "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies" a protected liberty interest is "squarely implicate[d]" under *Paul*).

Appellees argue that the CACI differs from the statute in *Valmonte*, because there is no requirement in California that an agency maintain a written record explaining why the person was suitable for employment or other government right. We disagree. The CACI requires agencies to undergo the same investigation to independently establish eligibility for a government benefit. The mere fact that agencies in California are not required to write anything down does not place any less of a burden on the Humphries' ability to obtain employment, a license, or custody than Valmonte experienced under the New York statute.

We emphasize that an injury that results merely from simple defamation is not a constitutional liberty interest under the "stigma-plus" test. *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991). Employment, licensing, custody, or other legal rights under California law are not refused merely because of the deleterious effect of a bad reputation. By operation of law,

California has effectively required agencies to consult the CACI, agencies will have to conduct an additional investigation to determine if the Humphries should be eligible for a government benefit, and those agencies will therefore be more hesitant to issue that benefit. As in *Valmonte*, the Humphries will not lose these benefits based merely on their reputation, these benefits "will be refused . . . simply because [their] inclusion on the list results in an added burden on employers who will therefore be reluctant to hire [them]." 18 F.3d at 1001.

We note that the Eleventh Circuit, in *Smith v. Siegelman*, denied a stigma-plus claim where the plaintiff was designated a child sexual abuser and placed on Alabama's Central Registry on Child Abuse and Neglect. 322 F.3d 1290, 1296-98 (11th Cir. 2003). We think *Smith* rests on a different footing. It appears that Alabama did not mandate that potential employers consult the Registry; rather, "the information on the Registry is made available to an employer or potential employer where the employment involves care or supervision of children." *Id.* at 1297; *see also* ALA. CODE § 26-14-8(d) (providing that the information in the registry "may be made available" to employers).[12] Accordingly, the Eleventh Circuit held that the Alabama scheme was governed by *Paul* because the plaintiff "was [not] denied any right or status other than his not being branded a child sexual abuser." *Id.* at 1297. As we have explained, the CACI is more than a registry that an employer "may" consult. By law, licensing agencies must consult the CACI, investigate, and use the CACI information in making their licensing decisions, *see, e.g.*, CAL. HEALTH & SAFETY CODE §§ 1522.1(a), 1526.8(b)(2), 1596.877(b). The

---

[12]Our understanding is that Alabama did not require employers to consult the Alabama registry, and therefore that *Siegelman* is closer to *Paul* than our case. If Alabama did require employers to consult the Alabama Registry and conduct further investigation, then we respectfully disagree with the Eleventh Circuit's holding that there is no "plus." Such a holding would fail to recognize that in *Paul* the reputational damage occurred inadvertently, and not as the result of a statutory mandate.

CACI is much closer to the New York Central Register than the Alabama Registry. *See Valmonte*, 18 F.3d at 1002 (explaining that "the injury associated with the [New York] Central Register is not simply that it exists, or that the list is available to potential employers" but rather that "employers *must* consult the list.").

In addition, the Eleventh Circuit either did not have evidence of or did not consider the possibility that as a result of the statutory framework other entities were effectively required to consult the registry as a matter of internal rule or custom. To the extent that the Eleventh Circuit refuses to recognize a liberty interest where the state functionally requires agencies to consult a stigmatizing list prior to conferring a government benefit, we must disagree. A state can alter a legal right or status without using the word "must"—the word "may" in conjunction with a rule or custom of "must" can equally deprive a citizen of a liberty interest giving rise to a procedural due process claim.

Thus, we conclude that the Humphries' legal rights or status have been altered. First, California has explicitly required some agencies to search a stigmatizing listing and conduct an additional investigation before issuing a license or benefit under state law. Second, California has made CACI information available to a variety of other agencies, and the Humphries have introduced evidence that those agencies—especially agencies charged with ensuring the safety and well-being of children—reflexively check the CACI before issuing a government license or benefit. Thus, being listed on the CACI places an added burden on entities wishing to confer legal rights or benefits, makes the chances of receiving a benefit conferred under California law less likely, and practically guarantees that conferral of that benefit will be delayed. Accordingly, we hold that the Humphries have satisfied the first step of the procedural due process analysis: They have a liberty interest in both their good name and using it to obtain a license, secure employment, become guardians, volunteer or

work for CASA, or adopt. Listing the Humphries on the CACI places a tangible burden on their ability to exercise this liberty interest. We proceed to consider whether they have been deprived of this interest without due process of law.

### 2.   Adequacy of the Procedural Safeguards

**[9]** The Humphries must show that the procedural safeguards of their liberty interest established by the state are constitutionally insufficient to protect their rights. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). California currently provides some minimal safeguards against erroneously listing someone on the CACI. In the first place, a reporting agency must conduct "an active investigation and determine[ ] that the report is not unfounded." CAL. PENAL CODE § 11169(a). Once the agency creates the report and forwards it to the CA DOJ, if a report "subsequently proves to be unfounded" the CA DOJ has a duty to "not retain the report." *Id.* Although this entire process is spelled out in the passive voice, it appears that the agency has the duty to correct its files and thus to decide if they are unfounded. *See id.* § 11170(a)(2) ("The submitting agencies are responsible for the accuracy, completeness, and retention of the reports."). CANRA also provides that the CACI "shall be continually updated by the [CA DOJ] and shall not contain any reports that are determined to be unfounded." CAL. PENAL CODE § 11170(a)(1). Once a report has been made to the CA DOJ and an entry made on the CACI, "the agency shall also notify in writing the known or suspected child abuser that he or she has been reported to the [CACI]." *Id.* § 11169(b).

**[10]** A person who believes he has been wrongfully listed on the CACI has two possible remedies under CANRA. First, a listed person might try to get the agency who originally reported the information to the CACI to correct its reports. As noted above, it appears that California agencies have a general duty to maintain accurate records and to advise CA DOJ of any report that subsequently proves unfounded. CAL. PENAL

CODE §§ 11169(a), 11170(a)(1). CANRA does not identify how an agency is to ensure that it has accurate records or who is responsible for correcting any errors. The CA DOJ's responsibility is limited to ensuring that the CACI "accurately reflects the report it receives from the submitting agency"—it does not appear to have any duty to ensure the accuracy of the report itself. *Id.* § 11170(a)(2); CAL. CODE REGS. tit. 11, § 904 (2008) (stating that the CA DOJ "presumes that the substance of the information provided is accurate and does not conduct a separate investigation to verify the accuracy of the investigation conducted by the submitting agency"). At best, CANRA implies that reports are subject to correction "by the investigator who conducted the investigation." *Id.* § 11165.12. However, California provides no formal mechanism for requesting that an investigator review a report or for appealing an investigator's refusal to revisit a prior report. Thus, for this first avenue of obtaining relief, at best an informal process exists in which the person seeking review must contact the agency blindly and hope the investigator is responsive. It is not clear what a person seeking review is to do if the investigator has transferred from the agency, retired, or died.

[11] Second, the person may rely on a licensing or employing agency to conduct its own investigation and to "draw[ ] independent conclusions regarding the quality of the evidence disclosed, and its sufficiency for making decisions regarding investigation, prosecution, licensing, placement of a child, employment or volunteer positions with a CASA program, or employment as a peace officer." *Id.* § 11170(b)(9)(A). Indeed, no particular process is required prior to the agency "drawing independent conclusions." Unless the agency unilaterally undertakes its own detailed investigation, it may only perpetuate any errors contained in the original report, even as it draws its own "independent conclusions." In addition, even if the agency has the time, funding, and resources to determine that the evidence contained in the CACI is erroneous or unfounded, it does not have power to expunge the listing.[13]

_____

[13]In most instances, California provides no formal means for reviewing or appealing an agency's independent determination. As we discuss in

Thus, in the best case scenario for an innocent person placed on the CACI, the only remedy under this avenue for relief is that the agency might still confer the government benefit after taking the time to conduct an added background investigation. The CACI listing, however, remains.

We evaluate the process that California provides persons listed on the CACI under the three part test set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Mathews* instructs us to balance (1) the private interest affected by the official action; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the governmental interest, including the fiscal and administrative burdens of additional procedures. *Id*. The procedural due process inquiry is made "case-by-case based on the total circumstances." *California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700, 711 (9th Cir. 2003). We will consider the private and governmental interests first, followed by a discussion of the risk of error in the procedures established by the state.

    a.   Private Interest

The Humphries' argument in support of their private interest at stake is essentially coextensive with their argument in support of their liberty interest. From all we have said, the Humpries have an interest in not being stigmatized by having their names included in a child abuse database that places a tangible burden on legal rights, if they have not committed the acts underlying the reports that led to their inclusion. Thus, they have an interest in pursuing employment and adoption, seeking to obtain custody of a relative's children, and securing the appropriate licenses for working with children without having to be subject to an additional investigation, delays, and possible denial of a benefit under California law due to an incorrect listing on the CACI.

---

greater detail below, denial of a right by DSS may be subject to judicial review. CAL. HEALTH & SAFETY CODE § 1526; CAL. FAMILY CODE § 8720.

### b.   Governmental Interest

There is no doubt that California has a vital interest in preventing child abuse and that the creation or maintenance of a central index, such as the CACI, is an effective and responsible means for California to secure its interest. *See Santosky v. Kramer*, 455 U.S. 745, 766 (1982); *People v. Stockton Pregnancy Control Med. Clinic*, 249 Cal. Rptr. 762, 772 (Cal. Ct. App. 1988) (finding the goals of detecting and preventing child abuse are a "compelling" government interest). Nevertheless, the operative question is not whether California has a significant interest in maintaining CACI—no one doubts that it does—but rather whether California has a significant interest in having a limited process by which an individual can challenge inclusion on the CACI, and to what extent adding additional processes will interfere with the overarching interest in protecting children from abuse.

We do not question, for example, that California has a significant interest in maintaining even "inconclusive" reports, which are reports that are neither "substantiated" nor "unfounded." *See* CAL. PENAL CODE §§ 11165.12, 11169(a). Such reports that only hint at abuse, when coupled with other information, can reveal patterns that might not otherwise be detected and can be useful to law enforcement. But it is equally apparent that California can have no interest in maintaining a system of records that contains incorrect or even false information. First, the effectiveness of a system listing individuals that pose a danger to children becomes less effective if a larger and larger percentage of the population erroneously becomes listed due to unsubstantiated claims. To clarify our point through an extreme example, it is obvious that if one hundred percent of the population were erroneously included in the CACI, it would provide no benefit to California in identifying dangerous individuals. Thus, the more false information included in a listing index such as the CACI, the less useful it becomes as an effective tool for protecting children from child abuse. In addition, there is a great human cost in

California, as elsewhere, to being falsely accused of being a child abuser. These costs are not only borne by the individuals falsely accused, but by their children and extended families, their neighbors and their employers. Indeed, with the same passion that California condemns the child abuser for his atrocious acts, it has an interest in protecting its citizens against such calumny.

**[12]** California contends that requiring any process beyond what it currently provides will substantially impair the state's ability to protect children because hearings are time-consuming and drain limited resources, resulting in less efficient delivery of primary services such as protecting children. It is true, of course, that giving individuals some additional procedure by which they can challenge their listing on CACI will impose administrative and fiscal burdens on California. However, generally these burdens are precisely the sort of administrative costs that we expect our government to shoulder. The state has not provided any evidence that the process required to sort through claims of an erroneous listing in the CACI is any more burdensome than the process due in any other context.

### c.   Risk of Erroneous Deprivation

The final, and perhaps most important, *Mathews* factor is the risk of erroneous deprivation and the probable value of additional procedural safeguards. As we evaluate this factor, we ask "considering the current process, what is the chance the state will make a mistake?" In this case, we ask, "after examining the process by which persons are listed on the CACI, what is the risk of someone being erroneously listed?" In light of the Humphries' allegations—and keeping in mind that we are reviewing a grant of summary judgment in favor of the state—the answer is "quite likely."

Appellees argue that the current procedures present little risk of erroneous deprivation because an agency may transmit

a child abuse report only after it "has conducted an active investigation and determined that the report is not unfounded." CAL. PENAL CODE § 11169(a). We are not assuaged. A determination that the report is "not unfounded" is a very low threshold. As we explained above, CANRA defines an "unfounded report" as a report that the investigator determines "to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect." CAL. PENAL CODE § 11165.12(a). Effectively, a determination that a report is "not unfounded" merely means that the investigator could not affirmatively say that the report is "false." This is the reverse of the presumption of innocence in our criminal justice system: the accused is presumed to be a child abuser and listed in CANRA unless the investigator determines that the report is false, improbable, or accidental. Incomplete or inadequate investigations must be reported for listing on the CACI.

We have no evidence in the record that indicates exactly how many "false positives" reporting agencies receive. *See Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003); *see also Kennedy v. Louisiana*, 128 S. Ct. 2641, 2663 (2008) (noting "[t]he problem of unreliable, induced, and even imagined child testimony"). However, given the high stakes in child abuse cases, presumably an agency investigation and child abuse report can be triggered by as little as an anonymous phone call. It is apparent in such a system there is a real danger of prank and spite calls. California should investigate such reports, and it can—and perhaps should—retain records on any reports it cannot determine to be "unfounded." When it retains all reports that are "not unfounded," it assumes a substantial risk that some of its reports are false, even if the investigator cannot prove to his own satisfaction that they are "unfounded." We understand the need for investigators who work off of hunches, disparate patterns, and minute clues to maintain files on unsubstantiated reports of child abuse for their own investigative purposes. But when such reports find their way into the CACI, there is a real risk that people, like

the Humphries, will have to explain publicly how their names ended up on the state's child abuse database.

**[13]** The record is devoid of any systematic study of the error rate in the CACI. We do note that in a 2004 self-study of CANRA, a California task force reported on a pilot program in San Diego County, where "DOJ discovered that approximately 50 percent of CACI listings originating from [one agency] should be purged because the supporting documentation was no longer maintained at the local level." *Child Abuse and Neglect Reporting Act Task Force Report* 24 (2004). The task force found that "[if] this percentage held true for the entire State it is possible that half of the 800,000 records which DOJ presently maintains in CACI should be purged." *Id.* We will not infer too much from this limited study, except to remark that it confirms our own observations about the low threshold for putting names on the CACI and the tendency to overinclude. As an initial matter then, we conclude that there is a substantial risk that California will deprive innocent persons of their "reputation-plus" by maintaining files on them in the CACI.

Any errors introduced at the time information is posted to the CACI arguably can be corrected. As we have noted, once the information is posted, the CA DOJ must notify the known or suspected child abuser that he has been reported to the CACI. CAL. PENAL CODE § 11169(b). At that point, if the person believes he has been reported in error, he has three options. First, he can try to informally persuade the investigator who reported it in the first place. Second, he can wait until an agency or other entity that is required to consult the CACI receives the information and rely on the agency or other entity's "independent conclusions regarding the quality of the evidence disclosed, and its sufficiency for making decisions." *Id.* § 11170(b)(9)(A). Third, once an agency makes an adverse decision, some persons have a right to appeal the decision in court. *See, e.g.,* CAL. HEALTH & SAFETY CODE § 1526 (provid-

ing a hearing after the denial of a license); CAL. FAMILY CODE § 8720 (providing for judicial review of an adoption denial).

None of these means for correcting erroneous information in the CACI is well designed to do so. We consider each in turn.

1. *Persuading the investigator.* First, attempting to persuade the investigating officer is not a satisfactory way to correct the records. The Humphries received notice that their names had been referred to the CACI. They were not told what information was there—although, given their recent experience, they had a pretty good idea—and were told, "If you believe the report is unfounded . . . please address your request to Detective M. Wilson." In other words, the only recourse offered to the Humphries was to try to get the investigator who had made the original determination that their case was "substantiated" to change his mind. Nothing in CANRA instructs Detective Wilson how to deal with the Humphries.[14] He is not required to respond to the Humphries or address their concerns or pleas in any way, he has been given no standard for reevaluating his initial judgment, and no one else other than Detective Wilson is required to respond to the Humphries. If Detective Wilson refuses to reconsider his original evaluation, the Humphries have no statutory recourse elsewhere within the LASD.

[14] The Humphries are in a tough position. They are not the only ones. Under the California scheme, Detective Wilson has been placed in a difficult situation, because he has been asked to revisit his initial judgment. Detective Wilson is, by training and employment, an investigator, not an adjudicator.

---

[14]Detective Wilson had actually left the department before the Humphries could petition him to revisit his decision. We refer to Detective Wilson in our analysis here as a surrogate for the investigating officer under the statutory scheme to show the limitations in the process afforded by CANRA.

That is not to say that investigators do not have to make important judgments; they do, but these judgments are subject to review, and Detective Wilson has none of the usual checks and balances to rely on. In the course of a criminal investigation, he may have his work reviewed by a superior within the LASD, or the District Attorney's office may review his judgment to decide whether to file formal charges. However, these reviews are likely to take place before any information is posted to the CACI and would have no effect on any review Wilson would undertake at the Humphries' request.[15] Effectively, Detective Wilson has been tasked with being investigator, prosecutor, judge, and jury with respect to the Humphries' CACI listing. He alone makes the initial judgment to place the Humphries on the CACI, with all of its legal consequences. Moreover, his judgment is apparently unreviewable except by himself. Since CANRA does not provide for formal review of a CACI listing, it also means that there are no standards for an investigator to review his prior decisions. Under such circumstances—where there is no standard, no superior outlet for review, and thus no danger of being overturned—it is unlikely that an investigator will, in effect, reverse himself. Any errors made in the initial referral to the CACI are, therefore, likely to be perpetuated through an informal appeal.

[15] The California system asks too much of its investigators in this situation. The Due Process Clause does not impose the separation of powers on the state or local governments. *See Colo. Gen. Assembly v. Salazar*, 541 U.S. 1093, 1095 (2004) (Rehnquist, C.J., dissenting from denial of certiorari); *Whalen v. United States*, 445 U.S. 684, 689 n.4 (1980). But

---

[15]This is demonstrated clearly in the Humphries' case. Although the Humphries had been booked on felony torture, the district attorney rejected the attempt to file a felony action against them, and only allowed the case to be filed for misdemeanor consideration. The district attorney then dismissed the remainder of the Humphries' case after learning of Dr. Paz's examinations of S.H.'s entire body with no sign of abuse. Nevertheless, this district attorney "review" of Detective Wilson's judgment had no effect on the Humphries' CACI listing.

the Due Process Clause may demand a separation of functions. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The burden on the Humphries is a heavy one:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias of prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.* Nevertheless, we think the burden has been met in this case, particularly when we consider the risk of erroneous deprivation in light of the interests of those whose names are placed on the CACI. We do not question the honesty and integrity of officials such as Detective Wilson. We simply believe that in this context, CANRA asks more of a state or local official than is reasonable.

**[16]** We wish to be clear: We do not adopt the proposition that "agency members who participate in an investigation are disqualified from adjudicating." *Id.* at 52. Such a proposition is belied by the cases and the "incredible variety of administrative mechanisms in this country." *Id.* Rather, we hold that a single person, charged with investigating serious allegations of child abuse, may not adjudicate those allegations for placement on the CACI and serve as appellate commissioner in review of his own decision. The risk of perpetuating any original error is too great.

2. *Reaching an independent agency conclusion.* Appellees also argue that there is little risk of erroneous deprivation

because an agency that has consulted the CACI must base its decision regarding the listed person on its own "independent conclusions." CAL. PENAL CODE § 11170(b)(9)(A). Furthermore, California regulations make it "the responsibility of authorized individuals or entities to obtain and review the underlying investigative report and make their own assessment of the merits of the child abuse report." CAL. CODE REGS. tit. 11, § 902 (2008). The decision maker "shall not act solely upon [CACI] information." *Id.*

First, we note that by the time the decision maker has referenced the CACI and become charged with undertaking an additional investigation, the individual liberty interest in avoiding stigma and alteration of a legal right has already occurred. Of course, the Due Process Clause does not always require the state to offer process to a person prior to the deprivation of a liberty interest, *see Gilbert v. Homar*, 520 U.S. 924, 930 (1997), but we note for purposes of determining the adequacy of the process offered by Appellees—additional investigation of a CACI listing to determine if a person should receive a government benefit—is the very type of interference with a liberty interest that an innocent person listed on the CACI seeks to avoid.

Second, even if the agency conducts a thorough investigation, nothing the agency decides affects the CACI listing; that is, even if an agency, conducting its own investigation, decides that the claims against a listed person are unfounded, the agency has no power to correct the CACI listing. The person is stuck in CACI-limbo. Thus, the process proferred by Appellees fails to address the stigma of being listed on the CACI and resolve the fact that other agencies will still be forced to consult the CACI to confer other benefits under the law.

Disregarding these limitations temporarily, it is not clear to us that an agency, in reality, can or will regularly engage in the process required to determine that charges against an indi-

vidual are unfounded. As a practical matter, when a person's name appears on the CACI, the agency must take that fact seriously and presume that the person has committed some kind of child abuse, even if there is no record of conviction. For example, before issuing a license for child care, we cannot imagine that an agency would issue the license to a person listed on the CACI—if it considers doing so at all—without undertaking an investigation to disprove whatever evidence existed that caused the person to be listed in the first place. To restate it in CANRA's own terms, the agency must satisfy itself that information that was "not unfounded" is "unfounded." The agency must be prepared to contradict the investigating agency.

The older the evidence, or the more involved the allegations, the more expensive it will be for the agency to disprove the allegations. We are not unfamiliar with the budgetary and time constraints that hamper government agencies. An agency with a limited budget, presented with the choice of thoroughly investigating allegations of child abuse so that it can issue a license, or simply denying the license after a cursory investigation so that it can spend its resources elsewhere, can reasonably be expected to choose the latter. We do not mean to imply that California agencies will not behave honestly or forthrightly, but we cannot help but observe that such entities bear a substantial burden, embedded in CANRA, to justify issuing a license to a person listed on the CACI. In sum, any agency—and especially agencies that deal with children—are likely to presume the integrity of the information found on the CACI, assume that individuals listed on the CACI actually abused children, and deny the license rather than risk awarding, for example, a child care license to a listed individual.

This case illustrates these problems. The Humphries allege that they have been erroneously placed on the CACI. In order to clear their name from this stigma, they must apply for a legal right or benefit of the state and subject themselves to an additional investigation before that right or benefit will be

conferred. If Craig or Wendy Humphries sought a license to care for children, the licensing agency would have to obtain and review the Humphries' 2001 "file prepared by the child protective agency which investigated the child abuse report." CAL. HEALTH AND SAFETY CODE § 1522.1(a). That file contains Detective Wilson's conclusion that the Humphries were "substantiated" child abusers. In order to protect the children that the Humphries will deal with, the agency is going to start with the presumption that it must deny the license unless it finds evidence contrary to Detective Wilson's investigation. So far as we can determine, the Humphries' file does not include the result of the dependency proceeding (including the finding of "not true"), or information about the dropped criminal charges (including the finding of "factually innocent"). Faced with the cost and time of investigating seven-year old allegations, there is no reason to assume that any agency would attempt to track down this information on its own. In the Humphries' case, the existence of such court records, if they could get them before the licensing agency, might go a long way to rebutting the presumption. Other applicants, however, may not be so fortunate as to have faced formal proceedings and had the proceedings resolved so clearly in their favor. In the case of a person who is accused of child abuse, but never formally charged, the agency would have to reinvestigate the underlying allegations, possibly requiring the examination of witnesses in order to satisfy itself that the original charges were erroneous. In the end, the agency may do what Sergeant Becker did when asked to review Detective Wilson's file. He simply relied on the fact that charges were filed as evidence "that some sort of crime did occur" and refused to give any weight to the fact that the charges were dismissed in court.

3. *Seeking court review.* Finally, Appellees argue that some persons adversely affected by decisions resulting from their listing on the CACI may seek redress in the legal system on a case-by-case basis. *See, e.g.,* CAL. HEALTH & SAFETY CODE § 1526 (providing a hearing after the denial of a license); CAL. FAMILY CODE § 8720 (providing for judicial

review of an adoption denial). The administrative review process offers some check on the system. As we know from our own experience, court review of agency decisions can be a cumbersome process. What is most troubling about the states' argument, however, is that even court review cannot solve the problem. Even if an individual is ultimately successful and obtains, for example, a child-care license, the court's favorable disposition has no apparent impact on the individual's listing on the CACI. Thus, the judicial review afforded by the statute faces the same problem as the original agency determination: It cannot end the stigma or the tangible burden on government rights that an individual listed on the CACI faces.

Again, the Humphries' experience is instructive. The Humphries have taken advantage of every procedure available to them, including the California courts. They went to the dependency court, which found that the allegations were "not true" and returned their children to them. They went to the prosecutor, who dropped all the charges against them. They went to the criminal court, which declared them "factually innocent" and sealed their arrest records. None of this had any effect on their CACI listing. They will remain on the CACI until the investigating agency submits corrected information to the system. There is no effective procedure for the Humphries to challenge this listing, and no way for them to be removed from the listing. The Humphries have been given no opportunity to be heard on the CACI listing.

[17] In sum, we are not persuaded that California has provided a sufficient process for ensuring that persons like the Humphries do not suffer the stigma of being labeled child abusers plus the loss of significant state benefits, such as child-care licenses or employment. The processes in place in California do not adequately reduce the risk of error. In *Valmonte*, which we previously discussed, the New York Central Register had far more procedural protections than the CACI—including a hotline for addressing erroneous listings, a formal investigation procedure, and two administrative hearings on

expungement—yet the Second Circuit found that there was a high risk of erroneous deprivation. 18 F.3d at 995-97, 1003-04. "The crux of the problem with the procedures," according to the Second Circuit, was that New York's " 'some credible evidence' standard results in many individuals being placed on the list who do not belong there." *Id.* at 1004. Again, unlike in California, in New York there *was* a detailed procedure for expungement from the list. *Id.* at 995-97. When the court looked at that procedure, it determined that seventy-five percent of those challenging their inclusion on the list were successful. *Id.* at 1003. This confirmed to the court that the original listing determination was suspect. *Id.* at 1003-04.

[18] Here, we do not have comparable statistical data on the rate of error because California has no expungement procedure. However, California's standard for referring names to the CACI—"not unfounded"—is, if anything, more encompassing than New York's word formula—"some credible evidence." Additionally, as we previously noted, even California has recognized, in its task force report, that it may have a high error rate on the CACI, perhaps as high as fifty percent. *Child Abuse and Neglect Reporting Act Task Force Report* at 24. We acknowledge that this figure is not necessarily statistically significant, and we will not treat it as such; however, it does serve as a general indication that a large percentage of the individuals listed on the CACI might have a legitimate basis for expungement. If we can learn any lesson from New York's experience, it is that California's CACI has the potential to be overinclusive, and perhaps vastly so. We note that as of 2004, there were an estimated 810,000 suspects on the CACI. *Id.* at 7. We echo the Second Circuit's observation: "[I]t [is] difficult to fathom how such a huge percentage of [Californians] could be included on a list . . . unless there has been a high rate of error in determinations." *Valmonte*, 18 F.3d at 1004. We conclude that there is a substantial risk that individuals will be erroneously listed on the CACI, and that California offers insufficient means for correcting those errors.

#### d.    Balancing

**[19]** *Mathews* requires that we consider the risk of error in light of the individuals' interest and the government's interest. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("The *Mathews* calculus . . . contemplates a judicious balancing of these concerns . . . ."). In the end, this is not a difficult case. The lack of any meaningful, guaranteed procedural safeguards before the initial placement on CACI combined with the lack of any effective process for removal from CACI violates the Humphries' due process rights. Undoubtedly, California has a strong interest in protecting its youngest and most vulnerable residents from abuse, but that interest is not harmed by a system which seeks to clear those falsely accused of child abuse from the state's databases. CANRA creates too great a risk of individuals being placed on the CACI list who do not belong there, and then remaining on the index indefinitely.

**[20]** Beyond declaring that California's procedural protections are constitutionally inadequate, we do not propose to spell out here precisely what kind of procedure California must create. The state has a great deal of flexibility in fashioning its procedures, and it should have the full range of options open to it. We do not hold that California must necessarily create some hearing prior to listing individuals on CACI. At the very least, however, California must promptly notify a suspected child abuser that his name is on the CACI and provide "some kind of hearing" by which he can challenge his inclusion. *See Goss v. Lopez*, 419 U.S. 565, 578 (1975); Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L. Rev. 1267 (1975) (discussing the various forms that a hearing can take). The opportunity to be heard on the allegations ought to be before someone other than the official who initially investigated the allegation and reported the name for inclusion on the CACI, and the standards for retaining a name on the CACI after it has been challenged ought to be carefully spelled out.

Nothing we have said here infringes on the ability of the police, or other agencies, to conduct a full investigation into allegations of child abuse. The need for such investigations—which, we acknowledge, are intrusive and difficult to conduct—is obvious. Nor does anything we have said undermine the ability of appropriate law enforcement agencies to maintain records on such investigations, even if the investigations do not result in formal charges or convictions. Again, we understand the need for law enforcement to rely on hunches and to collect bits and pieces of information to establish a history or pattern that may lead to formal charges in future cases. The mere maintenance of such investigatory files apart from the CACI does not raise concerns under the Due Process Clause. What California has done is not just maintain a central investigatory file, but attach legal consequences to the mere listing in such files. Once California effectively required agencies to consult the CACI before issuing licenses, the CACI ceased to be a mere investigatory tool. The fact of listing on the CACI became, in substance, a judgment against those listed.

B.   *Qualified Immunity*

Having decided that the Humphries' Due Process rights under the Fourteenth Amendment were violated, we next consider whether the individual defendants are entitled to qualified immunity. Officials who violate constitutional rights under color of law are entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Although the district court did not reach the issue of qualified immunity we may do so where it is clear from the record before us. *See Redding v. Safford Unified Sch. Dist. No. 1*, 531 F.3d 1071, 1078, 1087 (9th Cir. 2008) (en banc) (addressing qualified immunity analysis although the district court had found no constitutional violation).

First, Detective Ansberry is entitled to summary judgment in his favor. We have held that "[l]iability under § 1983 arises

only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The Humphries have not presented any evidence that Ansberry was in any way involved in the decision to list the Humphries in the CACI, or to keep them on the CACI.

Next we grant the motion for summary judgment in favor of Sheriff Baca. Under § 1983, a supervisor is only liable for his own acts. Where the constitutional violations were largely committed by subordinates the supervisor is liable only if he participated in or directed the violations. *Id*. There is no evidence that Sheriff Baca had any direct involvement in the decision to list the Humphries on the CACI, or to keep them on the CACI.

We also have no difficulty finding that Detective Wilson is entitled to qualified immunity. We have held that "an officer who acts in reliance on a duly-enacted statute . . . is ordinarily entitled to qualified immunity" which is lost only if it is "so obviously unconstitutional as to require a reasonable officer to refuse to enforce it." *Grossman v. City of Portland*, 33 F.3d 1200, 1209-10 (9th Cir. 1994). The California system, which denied the Humphries their procedural due process rights was not so obviously unconstitutional as to suggest to Detective Wilson that he ought not abide by CANRA's provisions and report the Humphries for listing on the CACI. A procedural due process analysis that requires a complicated balancing test is sufficiently unpredictable that it was not unreasonable for Detective Wilson to comply with the duly-enacted CANRA provisions. *See Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989). Therefore, Detective Wilson is entitled to qualified immunity for any damages resulting from the denial of the Humphries' procedural due process rights, and we grant summary judgment in his favor on that claim.

## C.  *Monell Liability*

Unlike Detective Wilson, the County is not entitled to qualified immunity for acting in good faith reliance on state law.

*See Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (finding that there is no qualified immunity for local government). Rather, the County is subject to liability under *Monell v. Department of Social Services*, if a "policy or custom" of the County deprived the Humphries of their constitutional rights. 436 U.S. 658, 694 (1978). The district court did not address the County's liability under *Monell* because it found no violation of the Humphries' constitutional rights.

We have held that "[i]n order to avoid summary judgment a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). CANRA itself did not create a sufficient procedure by which the Humphries could challenge their listing on the Index. Nothing in CANRA, however, prevented the LASD from creating an independent procedure that would allow the Humphries to challenge their listing on the Index. By failing to do so, it is possible that the LASD adopted a custom and policy that violated the Humphries' constitutional rights. However, because this issue is not clear based on the record before us on appeal—and because the issue was not briefed by the parties—we remand to the district court to determine whether or not the County is entitled to qualified immunity.

### III.   CONCLUSION

[21] For the reasons described above, CANRA violates the Humphries' procedural due process rights, in violation of 42 U.S.C. § 1983. We therefore reverse the district court's grant of summary judgment to the State and the County and remand for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment to Detectives Wilson and Ansbery and Sheriff Baca on the grounds of qualified immunity.

AFFIRMED   in   part;   REVERSED   in   part   and REMANDED.